**Carl F. MILLER, Plaintiff,**

**v.**

**John J. CALLAHAN, Commissioner of Social Security, Defendant.**

Civil No. L–95–3339.

United States District Court,
D. Maryland.

April 8, 1997.

Robert R. Jenkins, Baltimore, MD, for plaintiff.

Lynne A. Battaglia, United States Attorney, and Allen F. Loucks, Assistant United States Attorney, Baltimore, MD, for defendant.

## MEMORANDUM OPINION

GAUVEY, United States Magistrate Judge.

Carl L. Miller filed this civil action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. The case has been referred to the under-

signed magistrate judge for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301. Now pending before the Court are the parties' cross-motions for summary judgment. No hearing is necessary. Local Rule 105.6. For the reasons that follow, summary judgment will be GRANTED to the plaintiff and DENIED to the Commissioner.

### Procedural Background

The plaintiff, Carl L. Miller, concurrently filed applications for a period of disability, DIB and SSI on November 6, 1991. He alleged disability since December 20, 1984,[1] citing alcoholism, epileptic seizure disorder, and alcohol related balance problems. (R. 65). The plaintiff filed his most current application for SSI on January 1, 1994. (R. 10). All applications were denied initially and upon reconsideration. (R. 10). The plaintiff requested a hearing concerning his most current application on December 7, 1993. The hearing was held before an Administrative Law Judge on October 19, 1994, at which the plaintiff appeared and testified, represented by counsel, and a vocational expert ("VE") was present. (R. 39).

On January 6, 1995, the Administrative Law Judge ("ALJ") denied benefits to the plaintiff. The plaintiff requested a review of the ALJ's decision by the Appeals Council. On September 6, 1995, the Appeals Council denied the plaintiff's request, and accordingly, the decision of the ALJ became the final decision of the Commissioner of Social Security.

### General Background

Mr. Miller was 45 years old at the time of the hearing. He received an eighth grade education. He weighed 155 pounds, and although his usual weight was 175, he had recently weighed as little as 143. (R. 12, 41). He testified that had not driven in eight or nine years. On the rare occasions when he would leave his home, he would walk, but stated he could only walk about a block due to problems with balance. If he had something to hold onto, however, he could walk with little difficulty. (R. 53). He claimed to drink two 40-ounce bottles of beer per day and hard liquor occasionally. (R. 47). Though he was not specific, the plaintiff had at some time been charged with a crime involving alcohol, and he had undergone treatment in a clinic for alcoholism, including Antabuse treatment, fifteen years prior to the hearing; he had stopped drinking for a two-year period in the 1970s, but that was the last time he recalled remaining sober for such an extended period. (R. 47–48, 52).

He had worked as a machine operator in a metal polishing company, in a restaurant, and on a farm, but he stopped working in 1984 following an accident at the metal polishing company in which his left thumb was taken off by a machine that he was operating. (R. 48–49). It was subsequently reattached, but when his employer wanted him to return to work on that same machine, the plaintiff refused. He attributed the accident to his daily drinking habit, though he stated he had not been drinking as heavily then. (R. 50, 55).

The plaintiff claimed to suffer from periodic seizures. He has been prescribed Dilantin and phenobarbital to help control them, but he testified that he could not afford these medications and does not take them regularly; he believed that drinking helped to control seizures. He stated that he would have a seizure once or twice a month when not taking medication. (R. 51).

### Medical History

Mr. Miller received most of his medical care from Dr. Bernard Yukna. Dr. Yukna admitted treated the patient about once a year, though the record suggests slightly more frequent examinations.[2] Following examinations in August 1984, March 1987, September 1987, August 1988, August 1989, 1990

---

1. In his decision, the Administrative Law Judge stated that the plaintiff claimed to have been disabled as of February 20, 1984. (R. 10). According to the plaintiff's November 6, 1991 application, however, he alleged disability since December 20, 1984.

2. In November 1991, Dr. Yukna stated that Mr. Miller's visits to him occur only about once a year when his medical assistance is about to expire. (R. 148).

(month unknown), November 1991, September 1992, November 1992, January 1993, May 1993 and August 1993, Dr. Yukna's comments concerning the plaintiff were generally the same. Dr. Yukna repeatedly described the plaintiff as suffering from acute and chronic alcoholism and seizure disorder. (R. 143–5). He further repeatedly noted that the plaintiff had a wide-based and wobbly gait.

In November 1991, the plaintiff told Dr. Yukna that he was trying to limit himself to drinking only beer, that his seizures had improved as a result and that he did not experience seizures as long as he took his medication, though Mr. Miller added that he had been out of medication for a while. (R. 152). On the day of that examination, however, the doctor noted alcohol on the plaintiff's breath. (R. 152).

Dr. Yukna completed an SSA Medical Assessment Form for Mr. Miller in November 1991 in which he stated that Mr. Miller's heart and lungs were essentially normal. (R. 147). He found, however, that Mr. Miller had an abnormal and wide-based gait, his feet would flap down on the floor, his legs would quiver, and he held onto walls while walking down a corridor. He also stated that Mr. Miller had a personality disorder that manifested itself in chronic alcoholism of over 10 years duration; had a long history of alcohol-related seizures which could be controlled with medication when the plaintiff was able to get it; and that the plaintiff could converse normally and was oriented in all three spheres. (R. 147–8).

In November 1992, Dr. Yukna reported that the plaintiff claimed to have stopped drinking for an unspecified period and that when he did not drink he did not have seizures and his legs felt better. Nonetheless, the plaintiff stated that he had not been able to remain sober. He was alert, oriented, with good color, though he continued to walk with a wide-based gait. (R. 152).

In January 1993, Dr. Yukna completed another SSA Medical Assessment Form. (R. 155). He stated that Mr. Miller had a balance disorder resulting from nerve damage (peripheral neuropathy) in his legs due to alcohol use, as well as decreased sensation in

his legs. (R. 157). Dr. Yukna found no indication of cyanosis, and stated that the seizures are alcohol related. The plaintiff was said to be able to follow simple office directions, but that he had some type of unspecified personality disorder; the doctor thought he may have alcohol-related organic brain syndrome. (R. 157).

Dr. Yukna again completed a medical assessment form in August 1993. (R. 176). The report was virtually the same as his last report, except that he stated that he believed that fluctuating levels of alcohol in the plaintiff's system were related to his seizures, though the plaintiff had also suffered several blows to the head while drunk, which could also have caused organic brain damage that was then related to the seizures. (R. 176). Dr. Yukna knew of no CAT scans or EEGs having been taken. Dr. Yukna also stated that the plaintiff suffered a significant generalized anxiety disorder, and that he had chronic peptic ulcer disease. (R. 177).

On December 28, 1993, Dr. Yukna prepared a report for Mr. Miller's attorneys. (R. 181). He opined that Mr. Miller was precluded from any gainful activity and that there was no hope for improvement. He diagnosed chronic alcoholism with organic brain damage; degeneration of the cerebellum; seizure disorder due to alcohol and brain damage; chronic bronchitis; and antisocial personality disorder with an inability to respond to authority figures. (R. 181).

Emergency room records from the Francis Scott Key Medical Center are also in the plaintiff's medical record. These records show that he was treated in January 1993 for "stomach pains." (R. 158, 161). The final diagnosis was chronic pancreatitis. (R. 158, 166).

On February 11, 1993, Dr. Bernard Karpers, an internist, completed a consultative examination. (R. 167). He noted that the plaintiff had a thirty-four year history of alcohol use, though he claimed not to drink on the day of that examination. With treatment, the plaintiff claimed to have four seizures per year, but without treatment, he experienced eight or nine. (R. 167). The plaintiff was noted to have been treated for

hypertension, but no hospitalization was required. Dr. Karpers felt the tip of the plaintiff's liver which had some tenderness to palpation. The plaintiff indicated he had been through detoxification four times with delirium tremens. (R. 168). The plaintiff said he had been prescribed Phenobarbital, Dilantin, multivitamins containing iron, Librium, and anti-hypertensive medication. (R. 167).

He found that the plaintiff could not tandem walk, that the Romberg test was positive with falling to the right and posteriorly, and that he had an impaired ability to perform rapid alternating movements. (R. 169). He diagnosed the plaintiff with: chronic addiction to alcohol; cerebellar degeneration secondary to chronic alcoholism; and no evidence of significant pulmonary disease. He opined that the plaintiff could perform activities involving sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling "to some degree." (R. 170). An ambulatory aid would be required to maintain balance. He saw no signs of mental impairment other than the chronic alcohol use. (R. 170).

On March 25, 1993, Dr. Edward Ansel performed a consultative psychological evaluation of the plaintiff. (R. 171). The plaintiff arrived on time by himself, was oriented and neatly groomed. The doctor noted that the plaintiff's abnormal gait appeared, according to medical records, to result from cerebellar degeneration, and that he had trouble using his upper extremities or coordinating fine tasks. (R. 171). The doctor believes the following test results are accurate. (R. 172).

The plaintiff tested in the higher mentally retarded to the borderline intelligence range with a full scale I.Q. of 74. (R. 172). He had verbal memory and delayed recall in the average and low average ranges. (R. 173). There were no indications of psychotic disorder, but the plaintiff had some impairment of attention and concentration. He diagnosed the plaintiff with generalized anxiety disor-

der, adjustment disorder with depressed mood, and alcohol dependence. (R. 174).

### ALJ's Findings

The ALJ determined that the plaintiff was insured for purposes of DIB through December 31, 1989. It was determined that the plaintiff had a history of treatment for alcohol abuse and alcohol related seizures, that the plaintiff might suffer from a mild generalized anxiety disorder and mild adjustment disorder with depressed mood, and that he had borderline intelligence. Though the ALJ implicitly found these impairments to be severe [3] at the second step of the inquiry, he found that they did not singly or in combination meet or equal an impairment on the Listing of Impairments at the third step. (R. 16).

Given the medical evidence and the plaintiff's testimony, the ALJ concluded that the plaintiff had the residual functional capacity to perform a full range of sedentary work activity, and that he suffers from no nonexertional limitations that would significantly limit that ability. The ALJ found at the fourth step that the plaintiff was precluded from returning to his past relevant work as a machine operator which would require medium work exertion. (R. 17). Based on an application of the grids and testimony from a vocational expert, the ALJ determined, however, that the plaintiff could perform work at the sedentary level existing in significant numbers in the national economy, and was not under a disability at any time on or before the date of his opinion, January 6, 1995. (R. 17).

### Standard of Review

The function of this Court on review is not to try the plaintiff's claim *de novo*, but to leave the findings of fact to the Commissioner. This Court must determine upon the whole record whether the Commissioner's decision is supported by substantial evidence. *King v. Califano*, 599 F.2d 597 (4th Cir.1979); *Teague v. Califano*, 560 F.2d 615 (4th Cir.

---

3. The ALJ's Psychiatric Review Technique form suggests that he found the plaintiff had a severe impairment due to substance abuse that manifested itself in a personality disorder in which the

plaintiff had "inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress." (R. 24–5).

1977). Substantial evidence is more than a scintilla, but less than a preponderance of the evidence presented. *Laws v. Celebrezze,* 368 F.2d 640 (4th Cir.1966). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and must be sufficient to justify a refusal to direct a verdict were the case before a jury. *Teague v. Califano,* 560 F.2d at 618.

If there is substantial evidence to support the decision of the Commissioner, then that decision must be upheld. *Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir.1986); *Jolley v. Weinberger,* 537 F.2d 1179 (4th Cir.1976); *Blalock v. Richardson,* 483 F.2d 773 (4th Cir.1972); 42 U.S.C. § 405(g). In reviewing for substantial evidence, the court does not weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990). Notwithstanding the deference that this Court must show to the Commissioner's findings of fact, "a factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir.1987). After review, the court is empowered by 42 U.S.C. § 405(g) to affirm, modify, or reverse the decision of the Commissioner with or without remanding the case for a rehearing. *Melkonyan v. Sullivan,* 501 U.S. 89, 97–99, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991); *Harvey v. Heckler,* 814 F.2d 162, 165 (4th Cir.1987).

A claimant bears the burden of production and proof in showing that he meets the qualifications for finding disability[4] in the first four steps of the traditional five-step inquiry.[5] 20 C.F.R. § 404.1520; *Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995); *see also Coffman v. Bowen,* 829 F.2d 514, 518 (4th Cir.1987). If he succeeds in meeting the requirements of each of the four steps, the claimant has shown that he is *prima facie* disabled under the Social Security Act. *Pass,* 65 F.3d at 1203. At the fifth step, it becomes the Commissioner's burden to show that the plaintiff is nonetheless not disabled within the meaning of the Act because, despite his impairment, he retains the residual functional capacity to perform work that is available in the national economy. *Id.*

### Analysis

The plaintiff argues in this appeal that the Commissioner erroneously failed to give great weight to the opinion of his treating physician, Dr. Yukna, when that opinion was not contradicted by other persuasive evidence. (Paper No. 9 at 4–5). The plaintiff also argues that there is not substantial evidence to support the Commissioner's finding that the plaintiff can perform a full range of sedentary work because the plaintiff suffers a mental impairment and is restricted to simple, repetitive work. Since he has such an impairment, the grids cannot be relied upon exclusively to determine at the fifth step that the plaintiff is not disabled, and the questions posed to the VE did not accurately describe the plaintiff.

The defendant asserts that the Commissioner's decision must be affirmed because the recent enactment of P.L. 104–121, 110 Stat. 847 (1996) precludes awarding benefits in this case. (Paper No. 12 at 6). The Commissioner also argues that the opinion of Dr. Yukna need not be given great weight since his treatment relationship to the plain-

---

4. The Social Security Act defines a disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 400 *et. seq.*

5. In step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." If not, the ALJ proceeds to step two to determine whether the claimant has a medically severe impairment or combination of impairments. If so, the ALJ applies step three, which is

to determine whether the severe impairment is equivalent to one listed on the Listing of Impairments, which, if listed, directs a finding of disability. If the severe impairment is not listed, nor equal to one that is, the ALJ determines at the fourth step whether the impairment prevents the claimant from performing his past relevant work. If it does, the ALJ must determine at the fifth step whether the claimant can nonetheless perform other work in the national economy given his age, education, residual functional capacity, and work experience. 20 C.F.R. § 404.1520, 404.1521.

tiff was infrequent, and that Dr. Yukna's opinions were, in any event, inconsistent. (*Id.* at 9–10). Finally, the Commissioner argues that this Court should not address the issue of the adequacy of the questions asked of the VE since the plaintiff's attorney failed to ask alternative questions at the hearing,[6] or make this objection before the Appeals Council, precluding him from raising this argument now. (*Id.* at 10).

These arguments will be discussed in turn.

## I. *P.L. 104–121 § 105(b)(1) Does Not Necessarily Bar This Plaintiff's Claim for Benefits.*

■ As a preliminary matter, and for the reasons stated below, the Court finds that P.L. 104–121 §§ 105(a)(1) (amending Title II) and(b)(1) (amending Title XVI) do not apply to the judicial review of this claim and do not, therefore, direct a finding of "not disabled" solely because the claimant's severe impairments are the result of his alcoholism. Thus, contrary to the defendant's argument, P.L. 104–121 § 105 does not now serve to support the Commissioner's decision to deny this plaintiff DIB or SSI benefits.

P.L. 104–121 §§ 105(a)(1) and (b)(1),[7] enacted March 29, 1996, state that:

> An individual shall not be considered to be disabled for purposes of this title if alcoholism ... would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

Section 105(b)(5)(A)[8] establishes the applicability of the amendments to all claims "in the pipeline." The language of § 105(b)(5)(A) reads:

> The amendments made by paragraphs (1) and (4) shall apply to any individual who applies for, or whose claim is finally adjudicated by the Commissioner of Social Security with respect to, supplemen-

tal security income benefits under title XVI of the Social Security Act based on disability on or after the date of the enactment of this Act, and, in the case of any individual who has applied for, and whose claim has been *finally adjudicated by the Commissioner with respect to, such benefits before such date of enactment,* such amendments shall apply only with respect to such benefits for months beginning on or after January 1, 1997 (emphasis added).

Accordingly, all claims which have been "finally adjudicated by the Commissioner" prior to March 29, 1996, the date of enactment, are governed by the old law on alcohol-related disabilities (until January 1, 1997) but all claims which are finally adjudicated by the Commissioner after March 29, 1996 are subject immediately to the new law. The statute does not, however, define "finally adjudicated by the Commissioner."

For the following reasons, this Court finds that, although considerable debate exists on this issue, "finally adjudicated by the Commissioner" refers to the date on which the final administrative decision is made by the *Commissioner* (*i.e.,* the Appeals Council), not the date of final, favorable adjudication either at the administrative level, or if appealed, at the judicial level, as argued by the defendant, (Paper No. 12 at 8) nor the date on which the Commissioner is to perform the ministerial functions of calculating and paying benefits, as the Court orders in this case.

■ When a federal statute is enacted after the events in suit, the court must first determine whether Congress has expressly prescribed the statute's proper reach. *Landgraf v. USI Film Products,* 511 U.S. 244, 280–81, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994). When Congress has not so prescribed, the Court must determine

---

**6.** The Court finds no merit to this argument. As discussed in section III of this opinion, the attorney did ask an alternative hypothetical to the vocational expert that provided crucial evidence in this claim.

**7.** Contract With America Advancement Act of 1996, P.L. No. 104–121, 110 Stat. 847.

**8.** The language at § 105(b)(5)(A) (amending Title XVI) is identical to that of § 105(a)(5)(A) (amending Title II). Since the provisions referring to DIB and SSI are identical in P.L. 104–121 for purposes of this opinion, the Court will refer only to the sections relevant to SSI, though the arguments made are equally applicable to this plaintiff's claim for DIB.

whether the statute would have a retroactive effect. *Id.* In this case, Congress has arguably prescribed the proper reach of the statute through the language at § 105(b)(5)(A), and as stated above, this Court finds that the language most clearly supports the finding that the applicability of § 105(b)(1) depends on the date the Commissioner of Social Security makes her final decision in the case.

A. *The Language and Legislative History of the Statute Supports the Finding that Congress Has Prescribed the Statute's Proper Reach.*

The plain language of the statute, "finally adjudicated by the Commissioner of Social Security," supports the conclusion that Congress intended that § 105(b)(1) apply to claims in which a final decision was made by the Appeals Council *after* March 29, 1996.

The majority of the courts that have looked at this issue have found that this statutory language compels this conclusion. See *Newton v. Chater*, 92 F.3d 688, 696 n. 3 (8th Cir.1996) (finding that the date the Appeals Council denied the claimant's request for review was the "final administrative adjudication");[9] *Sampson v. Chater*, 99 F.3d 1150, 1996 WL 594274 n. 1 (10th Cir.1996) (finding that, since the claimant's case was decided by the Commissioner for Social Security prior to March 29, 1996, his claim was not foreclosed by P.L. 104–121, although had he been found eligible for benefits, his entitlement to them would end on January 1, 1997); *Flowers v. Chater*, 1996 WL 780146 (D.Or.1996) (holding that P.L. 104–121 does not foreclose payment of benefits when the claim is on appeal before the court because "the final administrative decision issued by the Appeals Council was issued prior to the date of [P.L. 104–121's] enactment," and thus, the claim was "finally adjudicated by the Commissioner" before the date of enactment); *Willis v. Chater*, 939 F.Supp. 1236 (W.D.Va.1996) ("The phrase 'finally adjudi-

cated by the Commissioner' means just that: the final decision made at the administrative level with regard to a claim under the Act."); *Martin v. Chater*, 938 F.Supp. 347 (W.D.Va. 1996) ("It is the decision of the Appeals Council that constitutes the final adjudication before the Commissioner."); *Santos v. Chater*, 942 F.Supp. 57 (D.Mass.1996) (finding that the phrase "finally adjudicated by the Commissioner of Social Security" refers to the Commissioner's final decision, not to any decision that the district court might make on appeal); *see also Perkins v. Chater*, 107 F.3d 1290 (7th Cir.1997) (dictum).[10]

This Court recognizes that its interpretation necessarily equates the term "finally adjudicated" with "final decision." The word "decision," as used in "final decision" is a term of art in the Social Security Act, but the word "final" is also a "deeply rooted term of art in the area of social security law." *Santos*, 942 F.Supp. at 64. As the court in *Santos* noted, the word "final" never refers to a decision made by a court on judicial review of the Commissioner's final decision. *Id.* "There is a presumption that the same words used twice in the same act have the same meaning." Sutherland Statutory Construction § 46.06 (5th ed.1992). That the word "finally" appears in P.L. 104–121 to modify "adjudication" suggests that the meaning of "finally adjudicated" is not different from that of "final decision." *See id.* at § 47.16 ("If the legislative intent or meaning of a statute is not clear, the meaning of doubtful words may be determined by reference to their relationship with other associated words and phrases .... a word may be defined by an accompanying word.").

Furthermore, this Court must give meaning to the phrase "by the Commissioner," which immediately follows "finally adjudicated." *Id.* at § 46.06 ("It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute."). The Commissioner's inter-

---

**9.** Though the court did not make this determination a holding of its opinion, the court obviously considered whether it would be bound by P.L. 104–121 at that stage in the appellate review process, finding that, in fact, it was not so bound since the "final adjudication by the Commissioner" had occurred prior to March 26, 1996.

**10.** *But see Sousa v. Chater*, 945 F.Supp. 1312 (E.D.Cal.1996); *Connor v. Chater*, 947 F.Supp. 56 (N.D.N.Y.1996); *Armstrong v. Chater*, (W.D.Okla.1996).

pretation ignores the modifying language "by the Commissioner." This modifying phrase pinpoints the date of the Commissioner's final decision as the relevant one, as opposed to the date that this Court might file its opinion on review, as the Commissioner argues. *See also Santos,* 942 F.Supp. at 63–64. The Commissioner has not provided any authority suggesting that the phrase "finally adjudicated" is a term of art, defeating its plain meaning. *See Perkins v. Chater,* 107 F.3d 1290, 1293. ("If the word 'Commissioner' we highlighted above really meant "Commissioner and all levels of judicial review," then applicants like Perkins would immediately need to meet the new standards. Perkins appears to have the better argument from a plain language standpoint, . . .")

The Ways and Means Committee's Report concerning its intent in enacting P.L. 104–121 does not direct a contrary finding. The report states:

> Generally, changes apply to benefits for months beginning on or after the date of enactment. However, *an individual entitled to benefits before the month of enactment would continue to be eligible for benefits* until January 1, 1997.

H.R.Rep. No. 104–379, 104th Cong., 1st Sess. 17 (1995) (emphasis added). This Court understands the language, "an individual entitled to benefits before the month of enactment would continue to be eligible" to mean that a person, such as this plaintiff, who had a valid claim to benefits under the law at the time he sought them, i.e., was "eligible" for those benefits before March 29, 1996 and could have received them had the administration made a correct determination, will be "eligible for those benefits" notwithstanding P.L. 104–101, even though his eligibility will cease as of January 1, 1997. Thus, the Court cannot accord deference to the Commissioner's interpretation (Paper No. 12 at 6), because the Court finds there is no "clear congressional intent favoring such a result." *Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505; *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had

an intention on the precise question at issue, that intention is the law and must be given effect.").

The Court is aware that a bill has been passed in the House of Representatives that would remove from P.L. 104–121 § 105(b)(5)(A) the phrase "by the Commissioner of Social Security" and would affirmatively include judicial review within the meaning of "finally adjudicated," which, if passed by the Senate and signed by the President, would make § 105(b)(1) applicable to this Court's judicial review of the pending appeal. *See* Social Security Miscellaneous Amendments Act of 1996, H.R. 4039, 104th Cong., 2d Sess. (1996). For two reasons, however, the Court does not find the existence of such proposed legislation a factor sufficient to alter its opinion.

First, the Senate failed to take any action regarding the House's proposed bill, allowing it to expire. A pronouncement by Congress is not relevant unless it is passed by both houses of Congress and is signed by the President. *See INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *compare* Sutherland Statutory Construction § 48.18 (5th ed.) ("Generally the rejection of an amendment indicates that the legislation does not intend the bill to include the provisions embodied in the rejected amendment."); *Teitelbaum v. Chater,* 949 F.Supp. 1206, 1215 n. 8 (E.D.Pa.1996). (Despite the fact that legislation has been introduced in the House of Representatives which would make it clear that a claim would "not be considered finally adjudicated . . . if . . . there is pending a request for either administrative or judicial review with respect to such claim," Social Security Miscellaneous Amendments Act of 1996, H.R. 4039, 104th Cong., 2nd Sess. (1996), that bill should not be given any weight by this court, particularly in view of the fact that the Senate has taken no action whatsoever with reference to it.) Thus, unless and until P.L. 104–121 § 105 *et, seq.* is amended to clarify the meaning of "finally adjudicated by the Commissioner of Social Security," this Court must interpret § 105(b)(5)(A) as it has done above.

Second, the fact that the House has proposed to remove the language "by the Com-

missioner of Social Security" from the amendment to the Social Security Act indicates that those words have a meaning contrary to that which the House would like it to have. "Adoption of an amendment *is evidence that the legislature intends to change the provision of the original bill.*" Sutherland Statutory Construction § 48.18. This therefore suggests that the language in P.L. 104–121, "by the Commissioner of Social Security," currently does refer to the final decision of the Commissioner prior to judicial review rather than to decisions made at subsequent dates.

In this case, because the Appeals Council denied further review of the ALJ's determination on September 6, 1995, making that the Commissioner's final decision, the claim was finally adjudicated at the administrative level "by the Commissioner of Social Security" before March 29, 1996. Under the plain language of § 105(b)(5)(A) and given the legislative history, the claim was finally adjudicated *before* the effective date of § 105(b)(1), and § 105(b)(1), therefore, does not apply to completely bar this claim, even if alcoholism is, in fact, a material factor contributing to a finding that this claimant is disabled.

B. *The Statute Would Have an Impermissibly Retroactive Effect Where Congress Has Not Clearly Shown That That Was Its Intent.*

▮▮▮ Not only does the Court find that Congress has prescribed the proper reach of P.L. 104–121 § 105 by continuing entitlement to benefits until January 1, 1997 to any claimant entitled to such benefits before March 29, 1996, but to find otherwise would have a retroactive effect to claimants in Mr. Miller's position. A statute that "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, in respect to transactions or considerations already past" are deemed retroactive. *Landgraf,* 511 U.S. 244, 269, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994). The default rule is that, absent clear congressional intent to the contrary, new statutes

are not to have retroactive effect. *Id.* Thus, the Court must determine "whether the new provision attaches new legal consequences to events completed before its enactment," making it retroactive without "clear congressional intent." *Id.* at 270, 114 S.Ct. at 1499.

The plaintiff's claim was finally adjudicated by the Commissioner of Social Security on September 6, 1995, prior to the enactment of P.L. 104–121 § 105(b)(1). The law existing as of September 6, 1995 would have not automatically denied benefits to this claimant even if it had been determined that alcoholism was a material factor contributing to a finding that he was disabled. *See Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir.1986); *Gordon v. Schweiker,* 725 F.2d 231 (4th Cir. 1984); *King v. Califano,* 599 F.2d 597 (4th Cir.1979). Thus, if this Court were to apply the new statute upon this review as the defendant argues, it would have a retroactive effect by taking away rights to benefits [11] that the claimant could, and in this case should, have acquired under the law as it existed at the time the Commissioner made her final decision in this matter, had she made it in accord with proper procedure, an entitlement that this Court finds is unchanged by P.L. 104–121.

As the Court discusses below, the Commissioner did not meet her burden at the fifth step in the inquiry and thus erred when she denied this plaintiff benefits. This plaintiff was qualified for benefits at that time under the law, and that right existed regardless of whether the Commissioner recognized it at the time of her final decision. "Both in legal and general usage, the normal meaning of entitlement includes a right or benefit for which a person qualifies, and it does not depend upon whether the right has been acknowledged or adjudicated. It means only that the person satisfies the prerequisites attached to the right." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 2595, 120 L.Ed.2d 379 (1992); *Teitelbaum v. Chater,* 949 F.Supp. 1206, 1211 (E.D.Pa.1996).

---

11. *See Goldberg v. Kelly,* 397 U.S. 254, 262 n. 8, 90 S.Ct. 1011, 1017 n. 8, 25 L.Ed.2d 287 (1970) (finding that "it may be more realistic today to regard welfare entitlements as more like 'property' than a 'gratuity.'").

Mr. Miller's right to benefits should have been recognized by the Commissioner prior to the enactment of P.L. 104–121. It would work a manifest injustice to apply P.L. 104–121 § 105(b)(1) for the first time on this appeal as the Commissioner suggests, not only because it disregards the plain language of the statute and the language at H.R.Rep. No. 104–379, but because it would retroactively deny a claimant benefits that should have already vested. *See Santos v. Chater,* 942 F.Supp. 57, 64 (D.Mass.1996)(finding that "the [Commissioner's] final, erroneous decision was made in 1995. Had the decision been correct, plaintiff would indisputably have received his benefits. The fact that the review process ran past March 1996 should not deprive plaintiff of benefits that a timely, correct decision would have given him."). The Commissioner's position is not a permissible interpretation of P.L. 104–121's effect since such an interpretation would attach "new consequences to events completed before" the statute's enactment as proscribed by *Landgraf.*

Having said this, the Court is not suggesting that Congress is precluded from making "substantive changes in the law of entitlement to public benefits." *See Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971). On the contrary, this Court agrees that this plaintiff is due benefits only to January 1, 1997 in accordance with P.L. 104–121.[12] As discussed above, however, this Court finds that P.L. 104–121 does not alter nor eliminate entitlement to benefits to claimants in Mr. Miller's position until January 1, 1997. P.L. 104–121 therefore affirms this plaintiff's continuing entitlement to benefits until January 1, 1997. *See* H.R.Rep. No. 104–379, 104th Cong., 1st Sess. 17 (1995).[13]

Finding that P.L. 104–121 § 105(b)(1) does not apply to bar benefits to this claimant upon this review, the Court now turns to a review of the Commissioner's final decision in this claim.

II. *The Commissioner Erred to the Extent the Commissioner Did Not Give Great Weight to the Opinions of the Treating Physician That Are Consistent With Other Medical Evidence on the Record.*

■ The plaintiff contends that the Commissioner would have found the plaintiff disabled had she given appropriate weight to the opinion of the treating physician, Dr. Yukna, who opined that the plaintiff was precluded from performing gainful work activity. (Paper No. 9 at 5). The Commissioner found that the evidence did not demonstrate an ongoing and significant relationship between the plaintiff and Dr. Yukna, but that the doctor performed only a series of short and routine check-ups, generally coinciding with the pending expiration of the plaintiff's medical assistance. (R. 13–4). The ALJ therefore stated that he did not give great weight to Dr. Yukna's opinions. (R. 181). This Court finds that, to the extent that the Commissioner did not give great weight to those opinions of Dr. Yukna that are consistent with other medical evidence on the record, the Commissioner erred.

■ "Circuit precedent does not require that a treating physician's testimony 'be given controlling weight,'" but if a "treating source's opinion ... is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record," it will be given controlling weight. *Craig v. Chater,* 76 F.3d 585, 590 (4th Cir. 1996) (*quoting* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). "Conversely, only if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig,* 76 F.3d at 590. Thus, to the extent that Dr. Yukna's opinions are not inconsistent with other sub-

---

12. This plaintiff's entitled to benefits will end as of January 1, 1997 unless he would still be found disabled even if he were to stop drinking alcohol.

13. The report states:
 Generally, changes apply to benefits for months beginning on or after the date of enact-

ment. However, *an individual entitled to benefits before the month of enactment would continue to be eligible for benefits* until January 1, 1997.
*See supra* discussion at 17.

stantial evidence on the record, those opinions should be given at least great weight.

The Court agrees that the record shows, and indeed, Dr. Yukna's own statements indicate, that he generally did not treat the plaintiff more than once or twice a year starting in 1987. (R. 143–152; R. 148). That is a factor to consider when determining the level of weight to give a treating physician's opinion. *See* 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii) (stating that the more knowledge the treating source has about a claimant's impairments, the more weight the opinion will receive). Dr. Yukna was nonetheless a treating physician, and his opinions were, on the whole, not inconsistent with those of the one-time examining physician Karpers and psychologist Ansel, nor were his opinions inconsistent one from another. *Id.* at (d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); *Id.* at (d)(6) ("When we consider how much weight to give to a medical opinion, we will also consider any factors ... of which we are aware, which tend to support or contradict the opinion.").

Regardless, it appears that the Commissioner did credit Dr. Yukna's opinions short of accepting Dr. Yukna's final conclusion that the plaintiff was disabled. The Commissioner found, as did Dr. Yukna, that the plaintiff had a history of alcohol abuse and apparent alcohol-related seizures, and that the evidence suggested generalized anxiety disorder and mild adjustment disorder, a finding not inconsistent with Dr. Yukna's conclusion that the plaintiff had "a personality disorder, but unsure exactly which type" and had an "antisocial personality disorder." (R. 157, 181).

█ The Commissioner did not, however, credit Dr. Yukna's report of December 28, 1993 in which he opined that the plaintiff was disabled. The Commissioner acted correctly in rejecting the doctor's opinion as to this ultimate conclusion. "The determination" of whether the claimant meets the statutory definition of disability is reserved to the [Commissioner], even when a medical source opinion includes a statement that a claimant is "disabled" or "unable to work." 20 C.F.R.

§§ 404.1527(e)(1), 416.927(e)(1); *Laws v. Celebrezze*, 368 F.2d 640, 644 (4th Cir.1966). It is the Commissioner who is to make that ultimate determination. Consequently, the ALJ was not required to adopt Dr. Yukna's conclusion of the plaintiff's disability. As to the other opinions on the record, however, the Court finds that they were entitled to great weight.

III. *There is Not Substantial Support in the Record to Show That the Claimant Could Control His Alcohol Intake.*

█ Where there is evidence of alcohol abuse, the Commissioner must inquire into whether the claimant is addicted to alcohol and has lost the ability to control its use since chronic alcoholism, alone or in combination with other impairment, may constitute a disability that makes gainful employment impossible, provided a showing of related functional loss is made. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir.1986); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.1984) ("Disability benefits cannot be denied because of a claimant's continued alcohol abuse if the claimant is unable voluntarily to stop drinking."; *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979)). The Commissioner found that the plaintiff could control his intake of alcohol because "claimant himself has indicated that, with regard to his history of alcohol, he has the ability to control his use of alcohol," because he testified that he currently drinks no more than two 40–ounces beers per day, and because he told Dr. Karpers that he had not had alcohol before meeting with that doctor. (R. 13). The Court does not find such evidence substantial. Although an ALJ is accorded deference as to determinations of a claimant's credibility, *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984), it is well recognized that an alcoholic's testimony as to his ability to control his use of alcohol is not reliable. *Swaim v. Califano*, 599 F.2d 1309 (4th Cir.1979) ("It has been held that the testimony of a true alcoholic, standing alone, cannot be relied upon as substantial evidence that the alcoholic can control his drinking problem").[14]

14. Furthermore, if the plaintiff's testimony is to be credited, this Court notes that the plaintiff

■ The Commissioner also found that the claimant showed no disabling end organ damage or cirrhosis. (R. 11, 13). However, significant end organ damage is not required for finding a disability due to alcohol. *Hicks v. Califano,* 600 F.2d 1048, 1051 (4th Cir. 1979). Thus, the Court does not find that the reasons provided by the Commissioner substantially support her conclusion that the plaintiff is not addicted to alcohol and finds that the Commissioner's determination is, in fact "against the substantial weight of the evidence and reflects application of inappropriate criteria." *See George v. Sullivan,* 1989 WL 280342 *9 (D.Md.1989).

Every doctor who examined and/or treated the plaintiff diagnosed him with chronic alcoholism. (R. 143–5, 147–8, 166, 170, 174). A diagnosis of chronic alcoholism usually means that the alcoholic is addicted to alcohol and is unable to voluntarily control his use. *George,* 1989 WL 280342 *9; *Cooper v. Bowen,* 815 F.2d 557, 560 (9th Cir.1987). The Commissioner's assertion that the claimant did not drink on the day of his examination with Dr. Karpers does not change this Court's finding that the record substantially supports the fact that this plaintiff could not control his use of alcohol. *See George,* 1989 WL 280342 *9 ("The fact that an alcoholic on occasion abstains from drinking for three or four days will not preclude a finding of disability resulting from alcohol dependence where the record contains substantial uncontradicted evidence that the plaintiff no longer has the ability to control [his] consumption.") (*citing Riley v. Heckler,* 585 F.Supp. 278, 284 (S.D.Ohio 1984); *Koszewski v. Bowen,* 700 F.Supp. 10, 11 (W.D.Pa.1988)).

In addition to repeated diagnoses for chronic alcoholism, the plaintiff was diagnosed by more than one doctor with alcohol-related impairments: seizure disorder [15] (R. 147); cerebral degeneration (R. 169, 171); pancreatitis [16] (R. 158, 166); peripheral neuropathy (R. 157); and organic brain syndrome (R. 157). Dr. Karpers noted that he could feel the edge of the plaintiff's liver and that there was tenderness to palpation in the upper right quadrant. (R. 169).

Other evidence supports the finding that the plaintiff could not control his alcohol use. The plaintiff had tried programs to help him stop drinking; Dr. Karpers noted that Mr. Miller had been in detoxification on four occasions (R. 168), and the plaintiff followed the Antabuse program, which resulted in a two year period of sobriety in the 1970s, followed by a relapse and fairly continual drinking since then. *See e.g., Coppejans v. Sullivan,* 811 F.Supp. 427 (S.D.Iowa 1992) (finding that repeated failed attempts to get successful treatment for alcoholism is evidence that contradicts any finding that the plaintiff can control his alcohol use); *George,* 1989 WL 280342 *9; *Lymore v. Heckler,* 1986 WL 9892 (E.D.Pa.1986) (finding that the fact that the plaintiff failed to remedy his alcohol problem even though he repeatedly went to the hospital for detoxification and attended Alcoholics Anonymous meetings is substantial evidence that the plaintiff could not control his drinking). Furthermore, despite his doctor's advise to stop drinking, the plaintiff had not done so. (R. 150, 152); *see e.g. George,* 1989 WL 280342 *9. This fact is particularly supportive of a finding of uncontrollable alcohol use when the plaintiff reported feeling better and suffering fewer seizures when not drinking, but relapsed into alcohol nonetheless. (R. 152 ("Had stopped drinking for a while, then [ ... ] relapse; feels like legs did feel better while he stopped.")). Finally, this man has a thirty-

also testified that, even though he drank about two 40–ounce beers per day, he would not be able to control his drinking if more alcohol were available to him than that ("If I had it, I would drink it"), that he had been drinking "any time he [could] get [alcohol]" since the age of ten, and that he routinely drank while on the job. (R. 52, 54–6). Drinking 80 ounces of beer a day hardly seems the actions of a man in true control of his alcohol intake.

15. The plaintiff stated that medication alleviated his seizures, but also stated several times that he could not regularly afford medication. The Fourth Circuit has stated that a finding of not disabled is not directed when the claimant cannot afford treatment that would ameliorate the defect. *Gordon v. Schweiker,* 725 F.2d 231, 237 (4th Cir.1984).

16. Pancreatitis is a condition often associated with alcoholism. *Murphy v. Heckler,* 613 F.Supp. 1233, 1234 (W.D.Pa.1985).

four year history of alcohol use, starting from the age of ten. (R. 54, 167).

The substantial weight of the evidence shows that as of the date of the Commissioner's final decision, Mr. Miller could not control his consumption of alcohol and, as discussed below, that he suffered resulting functional loss. The evidence further suggests that the plaintiff could not control his use of alcohol prior to the date his insured status expired for purposes of DIB, though that is a factual determination this Court reserves for the Commissioner upon remand.[17]

IV. *The Commissioner Was Required in this Claim to Consider the Testimony of the Vocational Expert Who Testified That a Person With this Claimant's Impairments Could Not Perform Sedentary Jobs Existing in Significant Numbers in the National Economy If He Could Not Control His Intake of Alcohol.*

A. *Substantial Evidence Does Not Support the Commissioner's Finding that the Plaintiff is Capable of Performing a Full Range of Sedentary Work, and Thus, the Grids May Not Be Relied Upon Exclusively.*

 The Commissioner determined that the plaintiff could perform a full range of sedentary work. (R. 14, 15). She apparently based this determination on the fact that the ALJ found that the claimant could control his alcohol use and that neither Dr. Karpers nor Dr. Ansel determined that the "claimant would be precluded from engaging in all forms of substantial gainful activity existing in significant numbers in the national economy." (R. 13). The ALJ then offered the conclusory statement that "after careful and complete consideration of all the evidence of record, the [ALJ] is persuaded that the claimant retains the residual functional capacity to engage in the full range of seden-

tary work activity." (R. 14). This Court finds that, not only is this factual determination not supported by substantial evidence on the record, but it is directly contradictory to the exertional limitations that the ALJ included in his hypothetical to the VE during the hearing. Finding that the record does not support the conclusion that the plaintiff can perform the "full range" of sedentary work, the Commissioner was therefore required to pose proper hypotheticals to the VE and to give consideration to her testimony.

 A full range of sedentary work involves:[18]

> lifting no more than ten pounds at a time and occasionally lifting articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Furthermore:

> Sedentary work implies a capacity to sit for at least 6 hours in an 8–hour day and to lift up to 10 pounds maximum. The ability to walk and stand up to approximately one-third of the work day (2–3 hours per day per 8–hour day) is also implied in sedentary work.

*Wilson v. Heckler,* 743 F.2d 218, 221 (4th Cir.1984). In addition, "most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." SSR 83–10.

The Commissioner is required to include in the text of her decision the reasons for making that decision. *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir.1986). The Commissioner failed to discuss what evidence shows that the plaintiff could perform the lifting, walking, standing, repetitive hand-finger action and other exertional requirements of seden-

---

**17.** The Court does not question whether the plaintiff was able to control his alcohol for purposes of entitlement to SSI. The evidence in the record supports the conclusion that he was addicted to alcohol prior to the date of the Commissioner's final decision and that he had been so

for over a year's time. *See* 42 U.S.C. § 1382c (a)(3)(A); 20 C.F.R. § 416.909.

**18.** A "full range" means "all or substantially all occupations existing at an exertional level." SSR. 83–10.

tary work as described in the above regulations, case law, and ruling.

The evidence shows, in fact, that the claimant could not perform the full or wide range of sedentary work as described above. While the ALJ noted the plaintiff had some ability to ambulate (R. 11), the medical evidence repeatedly shows that he had a wide-based gait, tended to hold onto walls for support, and as Dr. Karpers (whose opinion the ALJ gave considerable weight (R. 13)) noted, the plaintiff was unable to tandem walk, and "an ambulatory aid would be required to maintain balance." (R. 147, 169–70). The plaintiff's testimony supported these medical opinions. He stated that he could not stand for a long period of time due to a sense of imbalance, that the farthest he could walk at a time was one block, and that he had trouble walking unassisted for any distance. (R. 44, 53).

Relevant to the hand and finger manipulation requirements, Dr. Karpers stated that the plaintiff had an impaired ability to perform rapid alternating movements. (R. 169). Dr. Ansel found that the plaintiff "appear[ed] to have difficulty with coordination in fine tasks, using his upper extremities," and that "his hands were rather clumsy in handling the test materials." (R. 171–2). The ALJ failed to give recognition to the opinion of the administration's nonexamining physician who determined that the plaintiff had a limited ability to reach, handle, and finger, stating that "because of cerebellar disease, [the claimant] . . . can't do fine fingering." [19] (R. 88).

There is very little other direct evidence of the claimant's residual functional capacity in the record. In contrast with some of his other statements, Dr. Karpers found that "to some degree, this man is able to perform all activities involving sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and/or traveling." (R. 170) (emphasis added). Given that there are no limits as to time, distance, or weight involved in this summary of functional ability, however, this Court cannot find that it constitutes substantial evidence to support the conclusion that this plaintiff can perform the full or wide range of sedentary activity.

In addition, the ALJ's hypothetical to the VE sought information about an individual who suffered several exertional impairments that are incompatible with his factual finding that this plaintiff could perform the "full range" of sedentary work activity.[20] The ALJ asked the VE to determine which sedentary jobs a person would be able to perform if he was "precluded from performing any type of work requiring fine dexterity of the upper extremities." (R. 58). This qualification suggests that the ALJ found the plaintiff exertionally limited in such as way as would prevent him from performing the "full range" of sedentary work activity, as described in SSR 83–10.

■ The ALJ has a "duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record." *Cook,* 783 F.2d at 1173. The Court finds that the ALJ did not develop the record sufficiently to determine that the claimant could perform a full range of sedentary work as described by the regulations and rulings, and that to the extent that the ALJ did find the plaintiff exertionally limited, as evidenced by his hypothetical to the VE, the plaintiff would be precluded from performing that full range of work. "Without such explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Id.* Thus, the Court cannot conclude that the ALJ's determination in that regard is supported by substantial evidence.

**19.** Though difficult to read the signature, the nonexamining physician appears to be Dr. O'Mansky, M.D. (R. 88).

**20.** As discussed below, this Court finds substantial evidence on the record to support the exertional limitations that the ALJ did in fact insert in his hypothetical for consideration by the VE. The point of this section is to show that the ALJ's actual factual finding that the plaintiff had the residual functional capacity to perform a "full range" of sedentary work is not supported by the record, meaning that grids could not be exclusively relied on and that it was critical at the fifth step of the inquiry that the ALJ pose an accurate hypothetical to the VE and that he consider her response to that accurate hypothetical.

■ Because the evidence does not show the plaintiff could perform the full range of sedentary work activity, but rather suggests that he could not, the ALJ would not have been permitted to rely exclusively on the grids in determining at the fifth step whether the plaintiff was disabled, making the testimony of the VE critical to meeting the Commissioner's burden at the fifth step. When a claimant suffers "in exertion a disability that restricts him from performing the full range of activity covered by a category, the ALJ may not give preclusive effect to the grids and must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant." *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir.1985).

B. *The Commissioner Was Also Required to Consider the Testimony of the VE Because This Claimant Suffered Nonexertional Impairments.*

■ Where there is evidence that the claimant suffers from a nonexertional impairment as well as an exertional impairment, the grids are not conclusive, but may only serve as guidelines. *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir.1989); *Hammond*, 765 F.2d at 426. Although the ALJ found that Mr. Miller had a severe impairment based on a substance addiction disorder that manifested itself as a personality disorder, that the claimant suffered generalized anxiety disorder and adjustment disorder, the ALJ expressly did not find the claimant to have nonexertional limitations. (R. 12, 19, 24). Alcoholism is a non-exertional impairment, however, as are the disorders the ALJ noted. *Murphy v. Heckler*, 613 F.Supp. 1233, 1234 (W.D.Pa.1985) ("It is error for an ALJ not to consider non-exertional impairments, a classification that includes alcoholism, in combination with exertional impairments.").

In addition, low intelligence and lack of manual dexterity are also nonexertional impairments. *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir.1983). The ALJ found that the plaintiff had borderline intelligence based on Dr. Ansel's finding that the claimant had a full scale I.Q. of 74. (R. 16, 172). The record also shows that the plaintiff has im-

paired manual dexterity, a finding that the ALJ incorporated into his hypothetical to the VE. (R. 58, 88, 169, 171–2).

Since there is evidence on the record that shows that this claimant suffered from several nonexertional impairments, the grids may not alone support a finding of not disabled, and a vocational expert must offer testimony. *Walker*, 889 F.2d at 49; *Grant*, 699 F.2d at 192. Thus, in this case, the testimony of the VE was critical to the Commissioner's resolution of this claim at the fifth step.

C. *The Vocational Expert Found That a Person With Impairments Such as Those Demonstrated By This Claimant Could Not Perform Jobs Existing in Significant Numbers in the National Economy If He Could Not Control His Intake of Alcohol.*

■ In most regards, this Court finds that the hypothetical posed by the ALJ to the VE accurately described the plaintiff except that he did not describe a person unable to control his drinking. *See Swaim*, 599 F.2d at 1312 (finding that where the ALJ failed to address the issue of alcoholism in his hypothetical to the VE when the record substantially supported a finding of alcoholism, the claim had to be remanded because the hypothetical failed to fit the facts). The plaintiff's attorney added that fact to the hypothetical at which point the VE testified that no job would then exist in the national economy for such an individual. (R. 59). As discussed above, this Court finds no medical evidence to show that Mr. Miller could control his alcoholism. This, then, is a critical fact to include in the hypothetical.

When this fact was added to the hypothetical, the VE testified that such a person could not perform even a small range of sedentary jobs in the national economy. This testimony constituted substantial evidence. *Walker*, 889 F.2d at 50–51 ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.").

Given the VE's testimony and the substantial evidence on the record showing that the plaintiff could not control his use of alcohol, this Court, therefore, must find that the Commissioner failed to carry her burden at the fifth step in the inquiry and that the claimant should have been found disabled as defined in the Social Security Act.

Where the record does not show substantial evidence supporting the denial of benefits under the correct legal standard, and reopening the record would serve no useful purpose, reversal rather than remand is appropriate. *Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir.1987); *Millner v. Schweiker*, 725 F.2d 243, 246 (4th Cir.1984); *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir.1974); *George*, 1989 WL 280342 *10. Finding that to be the case, this Court reverses the Commissioner's decision denying benefits.[21]

### Conclusion

For the foregoing reasons, the plaintiff's Motion for Summary Judgment is GRANTED and the final decision of the Commissioner is REVERSED. This case is REMANDED to the Commissioner for an award of supplemental security income benefits. As to an award of disability insurance benefits, this case is REMANDED so that the Commissioner may determine the date on which the claimant became disabled due to an inability to control his intake of alcohol.

---

**21.** In finding that the Commissioner failed to meet her burden at the fifth step and that benefits should have been awarded, this Court is aware that the 1996 amendment to the Social Security Act mandates that Mr. Miller's eligibility for benefits could not extend beyond January 1, 1997 unless the Commissioner finds that the plaintiff would be disabled even if he stopped using alcohol. P.L. 104–121 §§ 105(a)(1), (b)(1), (a)(5)(A); 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).