Gerald W. LEITZKE, SS# 472–
48–7807, Plaintiff,

v.

John J. CALLAHAN, Acting Commis-
sioner of the Social Security Ad-
ministration,[1] Defendant.

No. CIV.5–96–251–JRT/RLE.

United States District Court,
D. Minnesota,
Fifth Division.

Sept. 2, 1997.

---

**1.** On March 1, 1997, President Clinton appointed John J. Callahan as Acting Commissioner of Social Security, replacing Shirley S. Chater. As a consequence, pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, he is automatically substituted as the named Defendant in this action.

Lionel Henry Peabody, Peabody Law Office, Duluth, MN, for Plaintiff.

Roylene Ann Champeaux, U.S. Atty., Minneapolis, MN, for Defendant.

## ORDER ADOPTING REPORT AND RECOMMENDATION

TUNHEIM, District Judge.

The above-entitled matter comes before the Court upon the Report and Recommen-dation of United States Magistrate Judge Raymond L. Erickson dated July 31, 1997. No objections have been filed to the Report and Recommendation in the time period permitted.

Based upon the Report and Recommendation of the Magistrate Judge, and all of the files, records and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. The plaintiff's motion for summary judgment [Docket No.8] is denied.

2. The defendant's motion for summary judgment [Docket No. 13] is denied.

3. This matter is remanded to the Commissioner for reconsideration, in accordance with the views expressed in the Report and Recommendation.

4. Pursuant to the holding in *Shalala v. Schaefer*, 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993), judgment be entered accordingly.

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, *Title 42 U.S.C. § 405(g)*, seeking a judicial review of the Commissioner's final decision which denied his application for Disability Insurance Benefits ("DIB"). The matter is presently before the Court upon the parties' Cross–Motions for Summary Judgment. For these purposes, the Plaintiff has appeared by Lionel H. Peabody, Esq., and the Defendant has appeared by Roylene A. Champeaux, Assistant United States Attorney.

For reasons which follow, we recommend that the Plaintiff's Motion for Summary Judgment be denied, that the Defendant's Motion be denied, and that the matter be remanded to the Commissioner for further proceedings in accordance with this Report.

## II. *Procedural History*

The Plaintiff protectively filed an application for DIB on July 19, 1994, alleging a disability since October 31, 1986, as a result of lower back and leg impairments, in addition to alcohol dependency and depression. Although the Plaintiff met the disability insurance requirements on his alleged date of onset, and continued to meet them through June 30, 1992, he was found ineligible upon the initial review of the Commissioner and, once again, upon reconsideration.

On January 23, 1995, the Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") and, on May 3, 1995, a Hearing was conducted, at which the Plaintiff appeared personally and by a non-attorney representative. Thereafter, on August 25, 1995, the ALJ issued a decision which denied the Plaintiff's request for benefits. The Plaintiff requested an administrative review before the Appeals Council which, on June 27, 1996, declined to review the matter further. Thus, the ALJ's determination became the final decision of the Commissioner. *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992); *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir.1992); *20 C.F.R. §§ 404.981, 416.1481.* This action was commenced on August 27, 1996.

## III. *Administrative Record*

A. *Factual Background.* The Plaintiff has twenty years of work experience as a rough carpenter, but he has not engaged in substantial gainful activity since October 31, 1986. At the time of the Hearing, the Plaintiff was 49 years old, and he had completed eight years of education. As related by the Plaintiff, he suffers from lower back pain, leg injuries, and from chronic chemical dependency.

On August 18, 1968, the Plaintiff—while on a tour of duty with the United States Army in Vietnam—sustained an injury when the helicopter, in which he was being transported, was shot down. [T. 326]. As a result, the Plaintiff suffered a closed fracture of his left distal femur, for which he was initially treated by a course of eight weeks in skeletal traction. *Id.* However, upon inadequate healing, he was transferred to the Fitzsimons General Hospital, in Denver. The Plaintiff's fracture did not heal for over one year and, consequently, on October 2, 1969, he underwent surgery to implant a plate, and a bone graft, to promote the healing process. [T. 331]. Following that surgery, a cane was recommended to assist in the Plaintiff's walking.

Nearly one year later, on September 17, 1970, the Plaintiff's leg injury was evaluated at the Veteran's Administration ("VA") Outpatient Clinic, at Fort Snelling. Dr. Overgard, the examining physician, reported that the Plaintiff experienced a one-and-a-half inch shortening of his left leg, which resulted from the plate implant, and the bone graft surgery. [T. 418–419]. However, Dr. Overgard also observed that the "leg is now progressing fairly well and he is able to use it more freely nearly every day," but "[m]uch walking causes swelling and pain, otherwise the condition seems good." [T. 418].

According to the Record, during the next ten years, the Plaintiff did not suffer severe problems, except for some pain in his knee. In fact, on August 17, 1977, Dr. Russeth, who practices at the VA hospital in Fort Snelling, recorded that the Plaintiff was "a healthy appearing man," and that he walked with a "mild left limp." [T. 436]. With respect to the Plaintiff's knee pain, Dr. Russeth noted that "the left knee was normal in appearance and motion was mildly limited." *Id.*

In 1980, the Plaintiff was examined at the VA hospital for complaints of pain in his lower back, as well as in his left hip. On September 26, 1980, Dr. Howell, his examining physician, reported that the Plaintiff's back condition was "definitely related to the service-connected left femur fracture with its resulting leg shortening and pelvic tilt." [T. 441]. Dr. Howell also diagnosed the Plaintiff as having "recurrent lumbar spine strain." *Id.* Six years later, on June 16, 1986, the Plaintiff suffered a contusion of his lower back as he fell backward after being struck in the face by a forklift at work. [T. 172]. However, by September 8, 1986, the Plaintiff was advised that he could return to work, once again, since he regained nearly all of the ranges of motion in his back. [T. 171].

On April 5, 1990, the Plaintiff underwent a spinal examination by Dr. Pollard, in Duluth. The examination revealed "parrot-beaking spurs on the second and third segments," while the lateral view of his spined disclosed a "2 [millimeter] retrolisthesis [2] of L5/S1." [T. 174]. During this examination, the Plaintiff related that he avoided lifting and bending, and that he had great difficulty sitting in a car, and walking up hills. [T. 175]. However, the Plaintiff stated that he was capable of washing dishes, albeit with some difficulty. *Id.* Treating notations, that were taken during his examination of April 5, 1990, also reported that the Plaintiff "[e]ats Tylenol like candy." *Id.*

Two weeks later, on April 20, 1990, the Plaintiff was admitted to the emergency room at St. Mary's Medical Center, appearing to be in a state of confusion. As reported in the Record, the Plaintiff ingested an entire bottle of Norflex,[3] and approximately 70 tablets of aspirin, during a period of 16 to 24 hours. [T. 178, 189]. The examining staff noted the smell of alcohol on his breath. *Id.* On the following day—April 21, 1990—the Plaintiff was admitted to St. Luke's Hospital because of confusion, and hallucinations, that had resulted from his aspirin ingestion. [T. 189].

Thereafter, on April 26, 1990, the Plaintiff was transferred to the Miller–Dwan Medical Center in Duluth, for treatment of alcoholism. [T. 180]. The Plaintiff's chemical use pattern was described by Dr. Egan, as follows:

> [Plaintiff] [s]tates his first drink was at about age 16. First drunk at about age 17. Between the ages of 17 and 21, drank two to three times a week, usually 4 to 6 beers per setting. Seldom got intoxicated. At age 21, married and pattern of drinking remained about the same. At age 22, went into the Army and stopped drinking completely. * * * At age 25, started drinking beer and drinking 3 to 5 days per week, 4 to 6 beers per day. This lasted until about age 29. * * * At age 29 to 35, drinking weekends. Drinking beer and vodka a half a quart or 12 beers per setting. At ages 35 to 40, drinking 4 to 6 times per week, up to a half a quart of peppermint schnapps along with a 12 pack of beer. At age 41, was divorced. From 41 to 44, drinking 5 to 7 days a week, a half a quart of vodka plus a 12 pack of beer per setting. This was up to and including the last 90 days.

[T. 182].

After completing an Alcohol Use Profile, while-at Miller–Dwan, the Plaintiff was diagnosed with alcoholism. *Id.* Dr. Egan observed that, in view of the Plaintiff's "drinking history, CD diagnostic interview, and AUP score, it appears that [Plaintiff] meets the criteria in the DSM IIIR for alcohol dependency * * *." [T. 183].

On May 1, 1990, the Plaintiff completed the Minnesota Multiphasic Personality Inventory ("MMPI"). Marcus Desmonde, the psychologist who administered and interpreted the MMPI, found that the Plaintiff was "definately [sic] not depressed or anxious or experiencing sleep difficulties," but that his mood was "elevated most of the time." [T. 186]. In addition, he found that the Plaintiff exhibited indications of "some post-traumatic stress." *Id.* Desmonde also found the Plaintiff's prognosis for treatment to be "generally poor because these individuals are experiencing little emotional distress, limiting there [sic] modivation [sic] for any intervention or change." *Id.*

Six weeks later, on June 15, 1990, Dr. Pollard, the Plaintiff's treating physician, evaluated his lower back impairments. Dr. Pollard found that the Plaintiff was suffering from "severe distress" in his lower back, which was caused by spurs on the lumbar vertebra, and by muscle spasms. [T. 443]. Dr. Pollard recommended that the Plaintiff wear a "built-up" shoe to limit the stress on his back, which was caused by his walking upon one shorter leg. In addition, Dr. Pol-

---

**2.** Retrolisthesis, or retrospondylolisthesis, refers to the posterior displacement of one vertebral body on its subjacent body. *Dorland's Illustrated Medical Dictionary,* p. 1456 (28th Ed.1994).

**3.** Norflex is a brand name for a preparation of orephenadrine, which is a skeletal muscle relaxant that is used in the treatment of acute muscle spasm. *Dorland's Illustrated Medical Dictionary,* p. 1192 (28th Ed.1994).

lard recommended physical therapy to treat the Plaintiff's back ailments. *Id.* However, Dr. Pollard noted that once his treatment recommendations were utilized, he expected the Plaintiff to be employable. *Id.*

On August 29, 1990, Dr. Peterson, a physician at the VA hospital in Minneapolis, also found that the Plaintiff was suffering from lower back distress, which he determined to be secondarily related to the Plaintiff's leg length discrepancy. [T. 444]. Additionally, the Plaintiff's x-rays showed "[s]pondylolysis at the right pars of L5 [and] [m]inimal disk space narrowing at L5–S1." [T. 445] Two years later, on December 4, 1992, the Plaintiff—complaining of back pain and arthritis in his knees—was treated, once again, at the VA hospital in Minneapolis. The Plaintiff's general exam demonstrated that his mild degenerative changes of the lumbosacral spine had not worsened. [T. 448]. However, the Plaintiff was found to be "very tremulous" and, upon questioning, he admitted to chemical dependency. [T. 447]. According to Dr. Stevenson, who was the examining physician, the Plaintiff had been drinking within the 24 hours prior to the examination. *Id.*

In June of 1993, the Plaintiff twisted his left ankle, and in March of 1994, he reinjured that ankle while carrying groceries. In addition to fracturing his ankle, he aggravated his old injury that had been caused by the helicopter crash in Vietnam. To correct these impairments, on March 22, 1994, the Plaintiff underwent surgery at St. Mary's Medical Center in Duluth. The surgery involved an arthrotomy [4] of his left ankle, including the repair of ligaments, and the removal of osteophytes.[5] [T. 191]. While the ankle was considered to be healing well by his surgeon, Dr. Kaiser, a consultative physician at St. Mary's Medical Center, Dr. Holcomb, remarked about the Plaintiff's alcoholism. Dr. Holcomb noted as follows:

> [The Plaintiff] has been drinking about a 12 pack of beer per week. No booze. No wine. He did stop drinking entirely 5 days

ago and he plans to continue off alcohol until after the surgery. He was dismissed from the hospital on multivitamins, but no antihypertensives. He ran out of the multivitamins and has been on no medications lately except for occasional Tylenol. [T. 193].

On July 19, 1994, the Plaintiff filed his application for DIB, alleging disability resulting from "arthritis, ankle knee and leg, post surgery on left leg, low back problems[,][and] chemical dependency." [T. 103]. The Plaintiff, in his Disability Report, also added that he becomes "very depressed because nothing is fun anymore." *Id.* In his Activities of Daily Living Questionnaire, which was completed on September 2, 1994, the Plaintiff advised that he watched television for five to eight hours per day. [T. 120]. In addition, he reported that he groomed and bathed himself daily, and that he spent three to four hours each day sleeping. *Id.* He noted that he cooked, visited friends and relatives, and talked to neighbors—all on a weekly basis. *Id.* The Plaintiff also recorded that, on a monthly basis, he cleaned his house, played cards or games, spoke on the telephone, and paid bills and handled his finances. *Id.*

The Plaintiff's Physical Capacity Assessment, which was completed on September 14, 1994, revealed that he could lift, or carry, 50 pounds "occasionally," and that he could lift, or carry, 25 pounds "frequently." [T. 154]. The Plaintiff was also found to be able to stand, and/or walk, about six hours in an eight-hour workday, and sit, with normal breaks, for a total of six hours in an eight-hour workday, *id.*, and his pushing and pulling abilities were found to be limited for the lower extremities. *Id.* While there were no manipulative, visual, communicative or environmental limitations imposed upon the Plaintiff, [T. 156–157], he was determined to be "occasionally" limited in climbing, stooping, crouching, and crawling. [T. 155].

In conjunction with his application for disability benefits, the Plaintiff also underwent a psychiatric review, on September 24, 1994.

---

**4.** Arthrotomy denotes the surgical incision of a joint. *Dorland's Illustrated Medical Dictionary,* p. 142 (28th Ed.1994).

**5.** Osteophytes are bony outgrowths or spurs. *Dorland's Illustrated Medical Dictionary,* p. 1202 (28th Ed.1994).

As recorded in his Psychiatric Technique Form, the Plaintiff was found to possess "Substance Addiction Disorders," [T. 138], as well as a pathological dependence on alcohol, and episodes of depression. *Id.* The Psychiatric Review Technique Form also reported that, in 1990, the Plaintiff had thoughts of suicide.

Also on September 24, 1994, the Plaintiff underwent a Mental Residual Functional Capacity Assessment. Overall, the Plaintiff was found to be "moderately limited" in both his ability to carry out detailed instructions, and in his ability to perform activities within a set schedule. [T. 148]. Additionally, the Plaintiff was found to be "moderately limited" in his ability to complete a normal workday, and workweek, without interruptions from psychologically based symptoms. [T. 149]. In all other areas, the Plaintiff was found not to be significantly limited. [T. 148–149].

Following his notice of denial, which was dated October 6, 1994, the Plaintiff filed for reconsideration, alleging several changes in his condition. Specifically, the Plaintiff alleged "constant daily pain due to arthritis and low back problems." [T. 123]. As well, the Plaintiff reported that he had trouble sleeping, and that he could not "seem to get comfortable at all." *Id.* He also added that, "[t]here is no way I could lift 50 [pounds] occasionally [and] 25 [pounds] frequently." *Id.* However, he stated that he could lift "maybe 20 [pounds] occasionally." *Id.* Ten days later, on October 20, 1994, the Plaintiff, in his Request for Reconsideration, simply stated that he is "disabled and cannot work." [T. 96].

On October 25, 1994, while serving his sentence, at the Northeast Regional Corrections Center, for driving while intoxicated, the Plaintiff's daily activities were documented in a questionnaire. It was noted that the Plaintiff "continues to be drug seeking, claiming physical problems worsening, [and][a] reduction in physical activity." [T.

128]. However, the activities questionnaire also revealed that the Plaintiff cleaned, read, and walked, several times a day. [T. 129].

Two months later, on December 29, 1994, the Plaintiff reported, in his request for a Hearing, that he was diagnosed with post-traumatic stress disorder ("PTSD"), and that he had been administered Prozac [6] and Trazadone.[7] He also noted that "[t]he pain is constant[,] I can't sit[,] walk or lay down[,] for any length of time." [T. 132].

From December 7, 1994, to January 6, 1995, the Plaintiff underwent chemical dependency treatment at the VA hospital in St. Cloud. During his treatment, the Plaintiff was diagnosed with PTSD, but he was hesitant to undergo further evaluation and treatment. [T. 254]. At the time of his discharge, the Plaintiff's condition was thought to be stable. He was placed on Prozac and Trazadone, for depression, and he was prescribed Naproxen, and Robaxin, for his back pain.

Finally, on March 8, 1995, the Plaintiff's psychological status was examined by Michael J. Muller, Ph.D., at the Twin Ports VA Outpatient Clinic. The Plaintiff scored a "five" on the Beck Hopelessness scale which, according to Dr. Muller, was considered to be mild. [T. 468]. However, the Plaintiff obtained a "Mississippi Score of 124" which, according to Dr. Muller, was consistent with PTSD. *Id.* Dr. Muller reported, as follows:

> [C]linical scales are rather evenly elevated and suggest a picture of chronic distress. The histrionic defense of denial is likely to be prominent. He is anxious, agitated, and depressed. He is emotionally labile. He is likely to be conflicted about interpersonal dependence. He reports frequent nightmares about Vietnam.

[T. 468–469].

Overall, Dr. Muller diagnosed the Plaintiff with alcohol dependence and PTSD. [T. 469].

B. *Final Decision of the Commissioner.* During the Hearing before the ALJ on May

---

6. Prozac is an antidepressant that is employed in the treatment of depression. *Dorland's Illustrated Medical Dictionary,* p. 877 (28th Ed.1994).

7. Trazadone hydrochloride is an antidepressant that is employed in the treatment of major depressive episodes with, or without, prominent anxiety. *Dorland's Illustrated Medical Dictionary,* p. 1736 (28th Ed.1994).

3, 1995, the Plaintiff testified about the limitations that he experiences because of his back and leg impairments. The Plaintiff testified that, on some days, he remains in bed as a result of pain in his back. [T. 32]. On other days, however, the Plaintiff leaves the house and walks with the aid of a cane. *Id.* He stated that he mainly walks his dog, for a distance of up to six blocks. [T. 34]. The Plaintiff also testified concerning his sleeping difficulties.

Next, the ALJ questioned the Plaintiff about the nature, and extensiveness, of his previous employment, and about the effect of his impairments on his ability to work. The Plaintiff explained that he had worked, for approximately 20 years, as a rough carpenter, building crates for shipping products. [T. 36]. When asked about the reason for quitting his employment, the Plaintiff explained that, by 1986, he was no longer able to perform his job duties because of his inability to pick up materials, and place them in shipping boxes. [T. 37]. Consequently, the Plaintiff added, he was laid off, and has not worked since, except for brief periods of time when he was employed at a fast-food restaurant, and at a knitting mill. [T. 39]. The Plaintiff also testified that he had not received formal training as a carpenter but, rather, that he had "just picked it up." [T. 40]. The Plaintiff related that he had finished the eighth grade in the course of nine years but, by the age of 16, he had dropped out of school and had begun full-time work. *Id.*

Next, the ALJ inquired about the Plaintiff's mental health treatment. In response, the Plaintiff explained that he attended counseling sessions, and that he took medications which "sometimes help[ed]." [T. 42]. Subsequently, the Plaintiff testified about the extent of his drinking. He stated that he consumed roughly three-quarters of a quart of vodka per day, beginning to drink early in the morning, upon his ex-wife's departure for work. The Plaintiff recounted that most of his alcohol consumption took place while his ex-wife, with whom he resides, is away from their home. [T. 44]. In addition to drinking, the Plaintiff watches television, washes the dishes, and walks his dog. Upon his ex-

wife's arrival home, the Plaintiff often visits relatives, and watches the television again. [T. 47]. The Plaintiff added that, two times a week, he is visited by a friend. [T. 49]. In addition, he clarified that neither his friend, nor his ex-wife, consume significant amounts of alcohol with him. *Id.* However, upon questioning from the ALJ, the Plaintiff admitted that he had consumed "four snorts" of alcohol, in the morning, prior to attending the Hearing. [T. 53].

Subsequently, the Plaintiff explained that he had never consumed one-half of a quart of vodka and a 12–pack of beer per day, five to seven days a week, as had been reported on May 25, 1990, in his discharge report from the Miller–Dwan Medical Center. Instead, the Plaintiff explained that he had consumed one-half of a quart of peppermint schnapps, in addition to "some beers before dinner." [T. 63]. As related by the Plaintiff, his alcohol abuse resulted in three charges of "driving while intoxicated," for which he served eight months at a "work farm," and 30 days in a County Jail. [T. 64]. The Plaintiff also testified that he experienced "blackouts"— his primary reason for no longer driving— and "shakes." [T. 65].

The Plaintiff further testified that he had not stolen to finance his drinking habit, and that, only once, had he been forced to sell his possessions—specifically, a toolbox—in order to pay for liquor. [T. 66]. He explained that the liquor store, where he makes his principal purchases, extends him a line of credit when he is unable to pay. *Id.* The Plaintiff stated that, about five to six years prior to the Hearing, he had contemplated suicide, but that he no longer experienced such thoughts. [T. 68–69].

Next, the ALJ questioned Dianne Leitzke, the Plaintiff's ex-wife, with whom he still resided. She testified that the Plaintiff drank at least one quart of vodka per day, based on the hidden bottles that she has found in their house. [T. 74]. Further, she explained that the Plaintiff has continued his drinking habit for the past eight to ten years. *Id.*

Following Dianne Leitzke's testimony, the ALJ called a medical expert ("ME"), Dr. Kent Newman, who is a licensed psycholo-

gist. Dr. Newman testified that, in his opinion, the "primary overlying situation here is that of chronic alcoholism." [T. 81–82]. He also noted the possibility of PTSD, and some symptoms of depression. Dr. Newman assessed the Plaintiff's social functioning as being "slightly" restricted as a result of his impairments, [T. 83], and he found the Plaintiff to experience "frequent" deficiencies in concentration, as well as "frequent" deficiencies in persistence and pace. *Id.* Finally, the Plaintiff was found to have "repeated" episodes of deterioration, resulting from his depression, PTSD, and alcoholism. [T. 84]. Overall, Dr. Newman found the Plaintiff's mental impairments to be of sufficient magnitude to meet disability Listings 12.04 and 12.06. [T. 83] *20 C.F.R. Pt. 404. Subp't P, App. 1 §§ 12.04 and 12.06.*

Next, the ALJ called Stewart Craig Hunter, a Vocational Expert ("VE"), to testify at the Hearing. In questioning the VE, the ALJ asked him to assume the following hypothetical:

> [A] 40[sic]-year-old man who has a 9th-grade education, and a work history similar to that[,] that is outlined in your vocational report, who is limited to sedentary work because of chronic pain, and who, because of other alleged maladies like alcoholism and depression, would be limited to simple tasks. And who physically would be limited by some degree of back pain, and so, stooping, climbing, crouching, crawling, and things of that nature should only be done on an occasional basis. However, the exertional level is sedentary, so I don't know that[,] that acts as a further

limitation. No foot controls. Okay, now, within that framework, are there jobs that exist in the economy?

[T. 85–86].

In response to this hypothetical, the VE testified that such an individual could perform a variety of sedentary occupations. For instance, the VE testified that the Plaintiff could work as a sorter, as an inspector, or in the performance of assembly work. According to the VE's testimony, there were some 60,000 sorting and assembly positions, with the occupation of laundry sorter alone, offering some 1,700 positions. [T. 86]

As noted, on August 25, 1995, the ALJ issued a final decision which denied the Plaintiff's claim for benefits. As she was required to do, the ALJ applied the sequential, five-step analysis prescribed by 20 C.F.R. § 404.1520.[8]

### IV.   *Discussion*

■■■ A.   *Standard of Review.* The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole. *Title 42 U.S.C. § 405(g)*; see, e.g., *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir., August 9, 1996); *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir.1996); *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir.1996); *Bates v. Chater*, 54 F.3d 529, 531 (8th Cir.1995). This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. *Morse v. Shalala*, 32 F.3d 1228, 1229 (8th Cir.1994); *Brock v. Secretary of Health and Human Services*, 791 F.2d 112, 114 (8th Cir.1986).

8. The sequential evaluation procedures used to determine an entitlement to DIB involves the five-step, sequential analysis of 20 C.F.R. § 404.1520, which has been paraphrased as follows:

> 1. If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> 2. If the claimant is not engaged in substantial gainful activity, [his] medical condition is evaluated to determine whether the impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.
> 3. If the impairment is severe, it is compared with the listed impairments the [Commissioner] acknowledges as precluding substantial gainful activity. If the impairment is equiva-

> lent to one of the listed impairments, the claimant is disabled.
> 4. If there is no conclusive determination of severe impairment, then the [Commissioner] determines whether the claimant is prevented from performing the work [he] performed in the past. If the claimant is able to perform [his] previous work, [he] is not disabled.
> 5. If the claimant cannot do [his] previous work, the [Commissioner] must determine whether [he] is able to perform other work in the national economy given [his] age, education, and work experience.

*Trenary v. Bowen*, 898 F.2d 1361, 1363–64, n. 3 (8th Cir.1990) (paraphrasing *Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S.Ct. 2287, 2290–92, 96 L.Ed.2d 119 (1987)).

The substantiality of the evidence must take into account whatever fairly detracts from its weight, see, *Newton v. Chater*, 92 F.3d 688, 692 (8th Cir.1996); *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir.1996); *Morse v. Shalala*, supra at 1229, and the notable distinction between "substantial evidence" and "substantial evidence on the record as a whole" must be observed. See, *Jackson v. Hartford Accident and Indemnity Co.*, 422 F.2d 1272, 1277 (8th Cir.1970) (Lay, J., concurring), cert. denied, 400 U.S. 855, 91 S.Ct. 86, 27 L.Ed.2d 92 (1970). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether or not substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was granted or denied. Cf., *Loving v. Secretary of Health and Human Services*, 16 F.3d 967, 969 (8th Cir. 1994); *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989).

■ Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir., August 22, 1996); *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir., August 5, 1996); *Reynolds v. Chater*, supra at 257; *Orteza v. Shalala*, 50 F.3d 748, 749 (8th Cir.1995). Therefore, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, we must affirm the decision. *Ostronski v. Chater*, supra at 416; *Mapes v. Chater*, supra at 262; *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir.1994). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir.1995); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993); *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir.1992).

■ Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions and, therefore, it embodies a "zone of choice" within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994); *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir.1991); *Steele v. Sullivan*, 911 F.2d 115, 116 (8th Cir.1990); but cf., *Oberst v. Shalala*, 2 F.3d 249 (8th Cir.1993) (Heaney, J., dissenting). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence nor review the factual record *de novo*. *Roe v. Chater*, supra at 675; *Harris v. Shalala*, supra at 1193; *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir.1994), citing *Loving v. Department of Health and Human Services*, supra at 969.

B. *Legal Analysis.* In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

1. The ALJ failed to fully and fairly develop the Record concerning the Plaintiff's mental impairments;

2. The ALJ's conclusion, that no severe mental impairments existed, is not supported by the Record as a whole; and

3. The ALJ's credibility determinations are not supported by substantial evidence on the Record as a whole.

We agree with the first of these contentions and, as consequence, we conclude that the final decision of the Commissioner was not supported by substantial evidence on the Record as a whole and, resultantly, that the remaining steps in his analysis were irretrievably infirm.[9]

■ 1. *Standard of Review.* Generally, it is well established that the ALJ is under an obligation, as the Administrative proceedings are nonadversarial, to fully and fairly develop the Record, even when the claimant is represented by counsel. *Miller v. Sullivan*, 953 F.2d 417 (8th Cir.1992); *Bishop v.*

---

9. In view of our Recommendation, we have no occasion to review the Plaintiff's other assignments of error, since the error we find necessarily invalidates the decision as a whole. Similarly, we do not address the ALJ's failure to complete, and attach to her decision, a Psychiatric Review

Technique Form, notwithstanding the presence of mental impairments. See, *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir.1992); see also, *Montgomery v. Shalala*, 30 F.3d 98, 99–101 (8th Cir. 1994).

*Sullivan,* 900 F.2d 1259, 1262 (8th Cir.1990); *Driggins v. Harris,* 657 F.2d 187, 188 (8th Cir.1981). The ALJ is not required, however, to function as the Plaintiff's substitute counsel, but is only to develop a reasonably complete Record. *Clark v. Shalala,* 28 F.3d 828, 830–31 (8th Cir.1993). When faced with an objection, that the ALJ has failed to properly develop the Record, the Court's inquiry must focus upon "whether [the Plaintiff] was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand." *Onstad v. Shalala,* 999 F.2d 1232, 1234 (8th Cir.1993); *Phelan v. Bowen,* 846 F.2d 478, 481 (8th Cir.1988).

2. *Legal Analysis.* The Plaintiff contends that the ALJ failed to fully and fairly develop the Record concerning his alleged mental impairments, by failing to solicit testimony from the ME, which would assist in ascertaining the date of the onset of the Plaintiff's mental impairments.

In this respect, the Plaintiff argues that the ALJ acted in contravention to Social Security Ruling ("SSR") 83–20, which, in pertinent part, reads as follows;

> How long the disease may be determined to have *existed at a disabling level* of severity depends on an informed judgment

of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

*SSR 83–20* [emphasis added].

In a purely technical sense, the application of SSR 83–20 is predicated upon the establishment of a disability and, because the ALJ did not find the Plaintiff to be disabled, it can well be argued that she was not obligated, by SSR 83–20, to determine the onset date. Irrespective of the applicability of SSR 83–20, however, we find that the ALJ failed to fully and fairly develop the Record for two reasons. First, we find that the ME's testimony constituted substantial evidence which was improperly rejected by the ALJ and, second, we conclude that the ALJ's finding, that the Plaintiff was not disabled by mental impairments during the period his eligibility for DIB, was improperly based upon an undeveloped Record.

■ Given the Record before us, we find that the ME's testimony constituted substantial evidence that the Plaintiff met the Listings for disability with respect to his mental impairments, which included PTSD, depression, and chronic alcoholism.[10] Dr. Newman,

---

**10.** Recent amendments to the Social Security Act, which were enacted on March 29, 1996, eliminate alcoholism or drug addiction as a basis for obtaining DIB. *Contract with America Advancement Act of 1996,* Pub.L. No. 104–121, 110 Stat. 847. Under Section 105 of the Act, any person, whose drug addiction is found to be a contributing factor material to a finding of disability, cannot be considered disabled and, therefore, entitled to benefits. P.L. No. 104–121 §§ 105(a)(1) (amending Title II of the Social Security Act); 105(b)(1) (amending Title XVI of the Social Security Act). In addition, these amendments "apply to any individual who applies for, or whose claim is finally adjudicated by the Commissioner of Social Security with respect to [DIB] based on disability on or after the date of the enactment of this Act * * *." *Id.,* § 105(a)(5)(A). Seizing upon this provision, the Commissioner requests that we interpret the phrase "finally adjudicated by the Commissioner" to preclude an award of DIB to an individual whose chemical dependency claim has not been finally adjudicated, in whole or in part, either at the administrative level or, if appealed, by a Federal Court, prior to the enactment of the new amendments.

There does not appear to be a consensus as to whether the new amendments apply to claims which were on appeal to a Federal Court, prior to the date of their enactment. Compare, *Miller v. Callahan,* 964 F.Supp. 939, 946–47 (D.Md. 1997) (amendments apply because a final decision by the Appeals Council means "finally adjudicated"); *Sousa v. Chater,* 945 F.Supp. 1312 (E.D.Cal.1996); *Armstrong v. Chater,* 949 F.Supp. 808, 810 (W.D.Okla.1996) (the amendments have application), with *Wilks v. Chater,* 1997 WL 158328, *10, n. 10 (N.D.Ill., March 31, 1997); *Santos v. Chater,* 942 F.Supp. 57 (D.Mass. 1996); *Willis v. Chater,* 939 F.Supp. 1236, 1241–42 (W.D.Va.1996); *Martin v. Chater,* 938 F.Supp. 347, 349 (W.D.Va.1996); *Teitelbaum v. Chater,* 949 F.Supp. 1206, 1209–1214 (E.D.Pa.1996) (the amendments do not apply). Moreover, our Court of Appeals has only briefly addressed this issue, in *dicta,* in *Newton v. Chater,* 92 F.3d 688, 695 n. 3 (8th Cir.1996).

Here, we need not resolve the issue of retroactivity for, even if we were to conclude that the amendments should have retrospective application, the Plaintiff's claim for DIB could still remain intact, as he is alleging more than chronic alcoholism as a disabling condition. Indeed, the

a licensed psychologist, testified, as an ME, at the ALJ's request. Specifically, Dr. Newman testified that the Plaintiff met the criteria for Listings 12.04 and 12.06. *20 C.F.R. Pt. 404. Subp't P.App. 1 §§ 12.04 and 12.06.* The Record is explicit on this point, as demonstrated by the following exchange between the ALJ and the ME:

> ALJ: Okay. Now, under 12.04 and 12.06, do you feel that these disorders are of listing magnitude?
>
> ME: Restriction of—oh, let's see. *Yes, I feel four is of magnitude, six is of magnitude, yeah.*

[T. 83] [emphasis added].

According to our Court of Appeals, in *Bentley v. Shalala,* 52 F.3d 784, 787 (8th Cir. 1995), "the ALJ may reject the conclusions of any medical expert, whether hired by a claimant or by the government, if inconsistent with the medical record as a whole." See also, *Bland v, Bowen,* 861 F.2d 533, 535 (8th Cir.1988) (refusing to revisit ALJ's resolution of conflicting psychological evaluations) Furthermore, "where the medical evidence is equally balanced, * * * the ALJ resolves the conflict." *Bentley v. Shalala,* supra at 787. However, the ME's testimony is of considerable import, and an ALJ may properly rely upon the opinion of an independent medical expert—such as Dr. Newman—as such opinions constitute substantial evidence. *Piepgras v. Chater,* 76 F.3d 233, 236 (8th Cir. 1996).

Here, we find that the ME's testimony constituted substantial evidence, as it was not inconsistent with the Record as a whole. For instance, notations from the VA hospital in St. Cloud, where the Plaintiff was treated for alcoholism, from December 7, 1994, to January 6, 1995, reveal that "the [patient] met DSM–III–R criteria for lifetime [and] current PTSD diagnosis." [11] [T. 254]. Moreover, on March 8, 1995, Dr. Muller, a psychologist at the Twin Ports VA clinic, found

that the Plaintiff's "Mississippi Score of 124" was consistent with PTSD. [T. 468]. While the ALJ refers to a statement of May 1, 1990, which is contained in an evaluation of the Plaintiff's MMPI, and which advised that the Plaintiff "is definately [sic] not depressed or anxious or experiencing sleep difficulties," the same evaluation later explains that "[there are] also indications of some post-traumatic stress and this individual may be reacting to an event in his history that continues to haunt him." [T. 186]. In addition, the Record reveals an episode of suicidal ideation, when the Plaintiff ingested approximately 70 aspirin tablets, and 24 Norflex pills, within a 16 to 24 hour period, which resulted in his hospitalization on April 20 and 21, 1990. [T. 178, 189]. Finally, we are mindful of our Court of Appeals caution that "PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation." *Jones v. Chater,* 65 F.3d 102, 103 (8th Cir.1995). In sum, because the ME's conclusions are not inconsistent with the Record as a whole, we find that the ALJ erred in rejecting the ME's findings. *Bentley v. Shalala,* supra at 787.

■ Second, we find that the Record was not fully developed to support the ALJ's conclusion, that the Plaintiff did not meet the Listings prior to June 30, 1992—which is the date on which he was last insured for DIB. In fact, upon examination of the Hearing testimony, we find that the ALJ failed to fully, and fairly, develop the Record concerning the date of onset of the Plaintiff's mental impairments. While the ME was specifically asked, by the Plaintiff's non-attorney representative, to determine the date of onset, the ALJ precluded the ME's response, as follows:

> REP: * * * From the record and the testimony, do you have a date or a time

---

Plaintiff, on PTSD grounds alone, could, ultimately, be found to be disabled. See, *Andler v. Chater,* 100 F.3d 1389, 1394 (8th Cir.1996). Of course, given the absence of appropriate findings, we express no opinion on the merits of the Plaintiff's claim.

**11.** We recognize that some of the evidence of mental impairment, that we address, postdates

the date on which the Plaintiff's insured status lapsed. Nevertheless, we are unable to say, on this Record, that this evidence does not reveal a condition of impairment which extended, continuously, from well prior to the Plaintiff's lapse of insured status.

where you think it became of this magnitude?

ME: I would have to really go searching the records there. He has a history of major depression in '89. A suicide attempt in '90, alcoholism's been in there for quite a while.

ALJ: Mr. Ehrbright, I'm going to suggest to you that, should we come up with a disability assessment, that I will search the record. Okay?

[T. 84].

However, in her Decision, the ALJ stated that, because the ME "did not testify as to the claimant's condition as of the alleged onset date to the date last insured * * * his testimony has no probative value in determining the issue of disability in this case." [T. 17]. In so concluding, we find that the ALJ failed to meet her obligation to more fully develop the Record relating to the date of onset. See, *Jones v. Chater*, supra at 104 (remanding, because the ALJ has a duty to "develop the record in such a way as to fairly evaluate the claim [which] may require additional record-building to establish with certainty the onset date of the impairment * * * *"). Frankly, to preclude the ME from determining a date of onset, when the ME expressed no inability to do so,[12] was sufficient error to recommend reversal, but we find wholly inexplicable the ALJ's reliance upon that preclusion to conclude that the ME had failed to determine a date of onset.

Accordingly, finding a fundamental, and irremediable error, which critically undermines the Commissioner's final decision, we recommend that the matter be remanded to the Commissioner for action consistent with this Report, and for the development of a proper Record concerning the Plaintiff's mental impairments. In furtherance of this determination, the ALJ may properly elect to employ the services of one, or more, independent MEs, who could examine the Plaintiff so as to provide an assessment of his mental condition and, as appropriate, a date of onset, upon a properly developed Record.

THEREFORE, It is—

RECOMMENDED:

1. That the Plaintiff's Motion [Docket No. 8] for Summary Judgment be denied.

2. That the Defendant's Motion [Docket No. 13] for Summary Judgment be denied.

3. That this matter be remanded to the Commissioner for a reconsideration, in accordance with the views expressed in this Report.

4. That, pursuant to the holding in *Shalala v. Schaefer*, 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993), Judgment be entered accordingly.

July 31, 1997.

### NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 15, 1997,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 15,**

---

12. Since the ME had determined that the Plaintiff satisfied the requirements of a Listing Impairment, we would not have thought it either unusual, or unexpected, that the ME would be asked to determine when that disability had commenced. More importantly, we seriously doubt that such a temporal determination would ever elude a thorough vetting of the Record. Here, by all appearances, the ME was prepared to canvass the Record, and his testimony expressly considered events which occurred before the expiration of the Plaintiff's insured status, and which were wholly consistent with a finding of disability. Nevertheless, without explanation, the ALJ curbed the ME's effort to address an issue, which was distinctly within his expertise, on the false hope that the ALJ would address the evidence responsibly. To say that the ALJ unfairly restricted the evidence in this proceeding, in a manner that was starkly prejudicial to the Plaintiff's interests, is a gross understatement.

1997, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.